Judge Berman

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
FAIRSTAR HEAVY TRANSPORT NV,      :
                                  :
                    Plaintiff,    :
                                  :        08 Civ.
                                  :        08  CIV  6889
    - against -                   :
                                  :
C&M GROUP LIMITED and C&M MARINE  :
SERVICES USA, INC.,               :
                                  :
                    Defendants.   :
-------------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, FAIRSTAR HEAVY TRANSPORT NV, (hereinafter referred to as "Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendants C&M GROUP LIMITED and C&M MARINE SERVICES USA, INC., (hereinafter referred to collectively as "Defendants") alleges, upon information and belief, as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333.

2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity organized and existing under foreign law with a principal place of business in Rotterdam, The Netherlands.

3.    Upon information and belief, Defendant C&M GROUP LIMITED was, and still is, a foreign corporation, or other business entity organized and existing under foreign law with a principal place of business in Aberdeen, Scotland, United Kingdom.

4.      Upon information and belief, Defendant C&M MARINE SERVICES USA, INC.,
was, and still is, a United States corporation, or other business entity organized and existing
under the laws of one of the states of the United States with a principal place of business in
Erath, LA and/or Houston, Texas.

5.      As evidenced by a charter party dated March 20, 2008 on the "Heavycon" charter
party form with C&M GROUP LIMITED as the named charterer (attached as Exhibit 1) and a
cargo receipt on the "Heavycon Receipt" form with C&M MARINE SERVICES USA, INC. as
the named charterer (attached as Exhibit 2), Plaintiff chartered to the Defendants the M/V
FJORD, a self-propelled, semi-submersible heavy transport vessel, for the carriage of
Defendants' ice breaking vessel, M/V ICE MAIDEN, from Mobile, AL to the A&P Tyne yard in
the United Kingdom.

6.      Plaintiff duly performed its obligations under the charter and carried the ice
breaking vessel ICE MAIDEN from the Untied States, across the Atlantic Ocean, and safely
delivered same to the A&P yard in the United Kingdom.

7.      Notwithstanding Plaintiff's full performance of its contractual obligations,
Defendants have breached their obligations under the terms of the charter party and cargo receipt
by refusing to pay to Plaintiff certain amounts that are due and owing in the principal amount of
$501,447. Defendants have not disputed that this amount is due but have nevertheless illegally
withheld payment. Plaintiff's principal damages, in the amount of $501,447, were incurred as a
result of Defendants' breach as more specifically itemized below.

8.      Under the contract, the demurrage rate, *i.e.*, the rate for delays in loading and/or
discharging cargo incurred at the load and/or discharge ports, is $75,000 per day. As set forth in
Plaintiff's Invoice dated June 30, 2008 (attached as Exhibit 3), the M/V FJORD was on

2

demurrage for 5 days and 7 hours, of which 2 days and 5 hours was incurred in the United States and 3 days and 2 hours was incurred in Europe. As such, Plaintiff's demurrage claim is calculated as 5 days and 7 hours multiplied by $75,000 per day for a total of $396,875.

9.     Additionally, as set forth in Plaintiff's Invoice attached as Exhibit 3, Plaintiff incurred project related costs, e.g., extra insurance costs, weather routing service costs, stand-by boat costs, all arranged and paid for by Plaintiff for and on behalf of Defendants, in the amount of $46,972.

10.     Further, as set forth in Plaintiff's Invoice attached as Exhibit 3, per Clause 15 of the charter party entitled "Bunker Escalation" Defendants are also liable to Plaintiff in the amount of $57,600 for fuel price differential. Specifically, Clause 15 provides that "This contract is concluded on the basis of the price per ton for bunker oil stated in Box 22 [USD 479 per metric ton] in force on the date of this contract. If the price actually paid by the Owners for the stated quantity of bunker oil [3,600 mt] should be higher, the difference shall be paid by the Charterers to the Owners." In this case the price actually paid by Plaintiff, i.e., $495/mt, was higher than the price stated in the contract, i.e., $479/mt. Thus the fuel cost differential is $16/mt multiplied by 3600 mt for a total of $57,600.

11.     Pursuant to the charter party and the cargo receipt that incorporated the terms of the charter party, all disputes must to be submitted to the High Court of Justice in London, England with English Law to apply. Plaintiff is preparing to commence its action against Defendants in London. In this regard, while Plaintiff has not received any notice from Defendants or any judicial body, the recently updated website of C&M GROUP LIMITED indicates that it is "in administration," which is a procedure under the insolvency laws of the United Kingdom that functions as a rescue mechanism for troubled companies and allows them

to carry on running their business. If true, this fact would likely impact *inter alia* the timing of Plaintiff's substantive claim against C&M GROUP LIMITED in the High Court of Justice. There is no indication that the American company, C&M MARINE SERVICES USA, INC., is similarly situated.

12.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. As best as can now be estimated, Plaintiff expects to recover the following amounts in the London litigation in respect of its claims against Defendants:

| A. | Principal claim: | $501,447; |
|----|------------------|-----------|
| B. | Interest on principal claim at 7% compounded quarterly for three years: | $116,055; |
| C. | Attorneys' fees and costs of litigation: | $200,000; |
| **Total:** | | **$817,502.** |

13.     The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. *See Murphy Affidavit attached as Exhibit 4.* However, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendants.

14.     The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, inter alia, any assets of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants and to secure the Plaintiff's claim as described above.

     **WHEREFORE**, Plaintiff prays:

4

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against them;

B.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$817,502** belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That this Court recognize and confirm any English judgment(s) rendered on the claims set forth herein as a Judgment of this Court.

D.    That this Court retain jurisdiction over this matter through the entry of any Judgment associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

E.    That this Court award Plaintiff its attorney's fees and costs of this action; and

F.    That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

5

July 31, 2008
New York, NY

The Plaintiff,
FAIRSTAR HEAVY TRANSPORT NV,

By: _____

Charles E. Murphy (CM 2125)
LENNON, MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
cem@lenmur.com

6

## ATTORNEY'S VERIFICATION

State of New York   )
               )    ss.:    New York City
County of New York   )

     1.      My name is Charles E. Murphy.

     2.      I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

     3.      I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

     4.      I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

     5.      The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

     6.      The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

     7.      I am authorized to make this Verification on behalf of the Plaintiff.

Dated:      July 31, 2008
             New York, NY

                                       Charles E. Murphy

# EXHIBIT 1

| 1. Place and date of Contract<br>ROTTERDAM, 20TH MARCH 2008<br>CONTRACT NUMBER: 035B G | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>STANDARD TRANSPORTATION CONTRACT FOR HEAVY<br>AND VOLUMINOUS CARGOES<br><br>CODE NAME: "HEAVYCON"<br>PART I |
|---|---|
| 2. Owners/place of business (Cl. 2.1.)<br>FAIRSTAR HEAVY TRANSPORT NV<br>6TH FLOOR SUITE E6, 170<br>CONRADSTRAAT 18<br>3013 AP ROTTERDAM<br>THE NETHERLANDS | 3. Charterers/place of business (Cl. 2.1.)<br>CSAI GROUP LIMITED<br>6-10 HOLLAND STREET<br>ABERDEEN AB25 3UJ<br>ABERDEENSHIRE<br>SCOTLAND |
| 4. Vessel (name, type and other particulars; also description of Owners' equipment) (Cl. 2.1. & 4.2.)<br>MV FJORD, SELF PROPELLED, SEMI SUBMERSIBLE HEAVY TRANSPORT VESSEL, ||
| 5. Cargo (full description of cargo; indicate whether full and complete cargo or part cargo; also state minimum/maximum weight of cargo) (Cl. 2.1. & 10.5.)<br>PARTIALLY CONVERTED VESSEL MV ICE MAIDEN, WITH UNSEALED OPENINGS IN DECK  BOTTOM TOGETHER WITH OTHER ITEMS, BLOCKS, ETC<br>BELONGING TO THE VESSEL UPTO FJORD'S CAPACITY, ESTIMATED WEIGHT APPROX 12000 MT; FULL AND COMPLETE CARGO. FINAL CARGO<br>DETAILS TO BE CONFIRMED BY CHARTERERS BY LATEST APRIL 11TH, 2008 ||
| 6. Loading port(s) (Cl. 2.1.)<br>MOBILE, ALABAMA, USA | 7. Discharging port(s) and intended route from loading port to discharging port<br>(Cl. 2.1. & 3.2.)<br>UK - BELFAST-TYNE RANGE TO BE DECLARED BY APRIL 11,2008; MOST<br>DIRECT AND SAFE ROUTE USING APPROPRIATE WEATHER ROUTING |
| 8. Loading method(s) (indicate alternative(s): (a),(b) or (c), as agreed) (Cl. 4.3.)<br>FLOAT ON OF ICE MAIDEN (a), LIFT ON ADDITIONAL CARGO (b) BY<br>CHARTERERS | 9. Discharging method(s) (indicate alternative(s): (a),(b) or (c), as agreed) (Cl. 4.6.)<br>FLOAT OFF ICE MAIDEN (a), LIFT OFF ADDITIONAL CARGO (b) BY<br>CHARTERERS |
| 10. First layday (Cl. 8.1.)<br>APRIL 28, 2008 | 11. Cancelling date (Cl. 8.1.)<br>MAY 2, 2008 |
| 12. Notices for loading to be given to (Cl. 9.1. & 9.2.)<br>CHARTERERS | 13. Notices for discharging (state interval periods and to whom to be given) (Cl. 9.2.<br>& 9.3.)<br>DAILY NOON POSITIONS, TOGETHER WITH UPDATED ETA, TO BE GIVEN<br>TO CHARTERERS |
| 14. Marine Surveyor(s) and date for transportation approval (Cl. 10.1. & 10.4.)<br>BMT MARINE AND OFFSHORE SURVEYS ||
| 15. Freight (Cl. 11.)<br>USD 5,350,000 (FIVE MILLION THREE HUNDRED AND FIFTY THOUSAND<br>UNITED STATES DOLLARS)<br>10% ON SIGNING CONTRACT<br>40% ON ISSUANCE OF NOR AFTER ARRIVAL<br>50% 2 DAYS PRIOR TO ARRIVAL AT DISCHARGE PORT | 16. Freight and demurrage, etc. payment (currency and where payable; also state<br>owners' bank account) (Cl. 11)<br>UNITED STATES DOLLARS<br><br>HSH NORDBANK<br>GERHART-HAUPTMANN PLATZ 60<br>20095 HAMBURG, GERMANY<br><br>TEL: + 49 40 3333 10453<br>FAX: + 49 40 3333 34307<br>SWIFT ADDRESS: HSHNDEHH<br>IN FAVOUR OF FAIRSTAR HEAVY TRANSPORT NV<br>ACCOUNT NO. 1100306277<br>IBAN: DE72210500001100306277 |
| 17. Free time for loading/discharging and canal transit (if applicable) (state total<br>number of running hours) (Cl. 12.1. & 14.1.)<br>4 DAYS FOR LOADING AND SEA FASTENING<br>3 DAYS FOR RELEASE AND DISCHARGING | 18. Demurrage rate per day (Cl. 12.2.)<br>USD 25,000 PRO RATA |
| | 19. Mobilisation charge (if agreed, state lump sum amount) (Cl. 13.1.)<br>NA |
| | 20. Demobilisation charge (if agreed, state lump sum amount) (Cl. 13.2.)<br>NA |
| 21. Canal transit costs (if any) limited to (Cl. 14.2.)<br>NA | 22. Price per ton of bunker oil (Cl. 15)<br>USD 470 PER MT, IFO 380, BASIS FIXED CONSUMPTION 2600 MT |

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

(continued)          "HEAVYCON" STANDARD CONTRACT FOR HEAVY AND VOLUMINOUS CARGOES          PART I

| 23. Termination Fee(s) (state amount(s) if agreed) (Cl. 20.1. & 20.2.) 50% OF THE FREIGHT AFTER SIGNING CONTRACT AND BEFORE DEPARTURE OF THE VESSEL FROM MALTA 75% OF THE FREIGHT AS FROM DEPARTURE OF THE VESSEL FROM MALTA 100% OF THE FREIGHT AFTER VESSEL ARRIVAL AT MOBILE | 24. Liability for cargo (state whether B/3 of Lading or Cargo Receipt) (Cl. 21.4. or Cl. 21.5.) CARGO RECEIPT |
|---|---|
| | 25. General average shall be adjusted/settled at (Cl. 25) LONDON, UNITED KINGDOM |
| 26. Brokerage and to whom payable (Cl. 31) 5% PAYABLE TO QUARTUS SHIPPING LIMITED, BISHOPS STORTFORD, HERTS, UK | 27. Law and arbitration (state 32.1., 32.2. or 32.3. of Cl. 32. as agreed; if 32.3. agreed state place of arbitration) (if Box 27 not filled in 32.1. shall apply) (Cl. 32) ENGLISH LAW, LONDON |
| 28. Numbers of additional clauses covering special provisions, if agreed 4 | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Contract consisting of PART I including additional clauses, if any agreed and stated in Box 28 and PART II. In the event of a conflict of conditions, the provisions of PART I and any additional clauses shall prevail over those of PART II to the extent of such conflict but no further.

| Signature (Owners) FARSTAR HEAVY TRANSPORT NV | Signature (Charterers) C&M GROUP LIMITED     2·|3|·8 |
|---|---|

MARIO KERSSENS
SALES & MARKETING DIRECTOR

## PART II
### "HEAVYCON" Standard Transportation Contract

**1. Definitions**     1

In this Contract the following words and expressions shall have the meanings hereby assigned to them.    2

1.1. "The Owners" shall mean the party identified in Box 2.    3
1.2. "The Charterers" shall mean the party identified in Box 3.    4
1.3. "The Vessel" shall mean the transportation unit(s) described in Box 4.    5
1.4. "Loading port" shall mean the port(s) or area(s) specified in Box 6.    6
1.5. "Discharging port" shall mean the port(s) or area(s) specified in Box 7.    7
1.6. "The Cargo" shall mean any goods or equipment or other items described in Box 5.    8, 9
1.7. "The Transportation" shall mean the carriage of the cargo, and, as the case may be, the loading, discharge and all other operations connected therewith.    10, 11, 12, 13

**2. Voyage**     14

2.1. It is agreed between the Owners mentioned in Box 2 and the Charterers mentioned in Box 3 that, subject to the terms and conditions of this Contract, the cargo described in Box 5 shall be transported by the Owners from the loading port(s) mentioned in Box 6, or so near thereunto as she may safely get and lie always safe and afloat, to the discharging port(s) mentioned in Box 7, or so near thereunto as she may safely get and lie always safe and afloat, by means of the Vessel named and described in Box 4 or in an appendix.    15, 16, 17, 18, 19, 20, 21, 22

2.2. At the commencement of the voyage the Owners shall exercise due diligence in making the Vessel seaworthy. The Owners shall perform the voyage with due despatch unless otherwise agreed.    23, 24, 25

**3. Deviation/Delays/Part Cargo**     26

3.1. The Vessel has the liberty to sail without pilots, and, subject to Charterer's approval which shall not be unreasonably withheld, to tow and/or assist vessels in all situations, to deviate for the purpose of saving life, to replenish bunkers and/or to deviate for the purpose of safety of the cargo, crew, Vessel and for any other reasonable purpose. However, excepting in the case of deviation caused for the purpose of ensuring safety of the cargo, no demurrage costs shall be payable.    27, 28, 29, 30

3.2. Without prejudice to the provisions of Clause 25, should the Master decide, for the purpose of the safety of the cargo, to deviate from the normal route which is stipulated in Box 7, the Charterers shall pay for all time lost as a consequence of the deviation at the demurrage rate stipulated in Box 18. The time lost shall include all time used until the Vessel reaches the same or equivalent position to that where the deviation commenced and the Charterers shall also pay all additional expenses incurred by such deviation including bunkers, port charges, pilotage, tug boats, agency fees and any other expenses whatsoever incurred.    31, 32, 33, 34, 35, 36, 37, 38, 39

3.3. If the Vessel for reasons beyond the Owners' control is being delayed at loading port(s) or place(s) and/or discharging port(s) or place(s), including obtaining free pratique, customs, port clearance or other formalities, such delays shall be paid for by the Charterers at the demurrage rate stipulated in Box 18.    40, 41, 42, 43, 44

3.4. Unless the cargo is described as a full and complete cargo in Box 5, the Owners shall have the liberty of receiving the cargo and of loading and of discharging other part cargo(es) for the account of others than the Charterers from places en route or not en route to places en route or not en route. The rotation of loading and discharging places shall be at the Owners' option.    45, 46, 47, 48, 49

When the Owners exercise such option(s) this shall in no way constitute a deviation, notwithstanding anything else contained in this Contract.    50, 51

**4. Loading and Discharging**     52

4.1. The Charterers shall have the cargo in all respects ready for the said voyage at the loading port(s) on the date for which notice of expected loading readiness is given by the Owners as per Clause 8, but not before the date stated in Box 10 as first layday.    53, 54, 55, 56

The precise loading area or place within the agreed loading port, which shall be always safe and accessible and suitable for the loading operation, shall be nominated by the Charterers upon receipt of the first notice given by the Owners pursuant to Clause 8, always subject to the approval of the Owners and the Master. Such approval shall not be unreasonably withheld.    57, 58, 59, 60, 61

4.2. The Owners shall provide the equipment stated in Box 4 or in an appendix and shall in their own time and at their own expense prepare such equipment for the loading. All other equipment required for cribbing, seafastening, guide posts and stumps shall be provided by the Charterers/Owner. The Charterers shall arrange and pay for any cribbing, lifting gear for loading and positioning of the non-floating other items, blocks, etc. belonging to the vessel. When the cargo has been loaded and positioned, it shall be    62, 63, 64, 65

seafastened and/or lashed by the Owners at their expense to the satisfaction of the Master and Warranty Surveyor.    66, 67

4.3. At the loading port, the cargo shall be delivered by the Charterers without delay in the sequence required by the Master at any time during daylight hours or    68, 69

night, Saturdays, Sundays and holidays included and shall be loaded by one or more of the following methods stated in Box 8:    70, 71

*) (a) If agreed in Box 8 that the Owners shall load the cargo with their own gear or tackle, the Charterers shall bring the cargo alongside within reach of such loading equipment. The Owners shall provide the necessary labour and winchmen, either from the crew or from ashore and shall pay for same except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account.    72, 73, 74, 75, 76, 77

*) (b) If agreed in Box 8 that the Charterers shall perform the loading, the cargo shall be placed on board and positioned by the Charterers to the full satisfaction of the Master. The Charterers shall procure and pay for all labour and all necessary equipment other than that stated in Box 4.    78, 79, 80, 81

*) (c) If agreed in Box 8 that the cargo shall be loaded by means of float-on method, the Charterers shall position the cargo prior to loading, at 60 metres or at an agreed distance from the Vessel's submerged deck to the full satisfaction of the Master. The Owners shall attach lines to the cargo and shall position and secure the cargo over the submerged deck by using winches and/or tugs. The Owners shall procure and pay the necessary labour and winchmen either from the crew or from shore except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account.    82, 83, 84, 85, 86, 87, 88, 89, 90

The Charterers shall procure and pay for workboats and tugs required for the positioning of the cargo. The Owners shall have the right to use such workboats and tugs for the loading operation reimbursing the Charterers for the actual costs for the use started from the time the Vessel's lines first attached to the cargo until the time when the last line is released from the cargo and the workboats and tugs are dismissed by the Owners.    91, 92, 93, 94, 95, 96

*) Indicate alternative(s) (a), (b) or (c), as agreed, in Box 8.

4.4. The precise discharging area or place within the discharging port and which shall be always safe and accessible and suitable for the discharging operation, shall be named by the Charterers well in advance of the Vessel's arrival, always subject to the approval of the Owners. Such approval shall not be unreasonably withheld.    97, 98, 99, 100, 101, 102

At the discharging port the Charterers shall take delivery of the cargo without delay in accordance with Clause 4.5, at any time during daylight hours or night, Saturdays, Sundays and holidays included.    103, 104, 105

4.5. Prior to actual discharge the Owners shall, unless otherwise agreed, remove all seafastening and/or lashing and prepare the Vessel for the discharge operation. The entire discharge operation always to be done to the full satisfaction of the Master.    106, 107, 108, 109

4.5. The cargo shall be discharged by one or more of the following methods stated in Box 9:    110, 111

*) (a) If agreed in Box 9 that the Owners shall discharge the cargo with their own gear or tackle, the Charterers shall take delivery of the cargo upon discharge and within reach of said gear or tackle. The Owners shall procure and pay for necessary winchmen and labour to perform the discharge except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account.    112, 113, 114, 115, 116, 117

*) (b) If agreed in Box 9 that the Charterers shall discharge the cargo, the Charterers shall procure and pay for the necessary equipment and labour for the discharge of the cargo. Owners shall remove all seafastenings and/or lashings prior to discharge at their time and expense    118, 119, 120

*) (c) If agreed in Box 9 that the cargo shall be discharged by means of float-off method, the Owners shall submerge the Vessel and float-off the cargo. The Owners shall procure and pay the necessary labour and winchmen either from the crew or from ashore except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account. The Charterers shall procure and pay for workboats and tugs required for discharging the cargo. The Owners shall have the right to use such workboats and tugs for the discharging operation reimbursing the Charterers for the actual cost for the use thereof from the time when the first line is attached to the cargo until the time when the last part of the cargo passes the side of the Vessel at which time the Charterers shall take custody of the cargo. Owners shall arrange for and pay any and all costs associated with the discharge of the cargo from the deck of the vessel on completion of all discharge operations.    121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132

*) Indicate alternative(s) (a), (b) or (c), as agreed, in Box 9.

4.7. All expenses associated with the Vessel such as harbour dues, pilotages, boat/tug assistance, if required, agency fees, fuel and lubricants shall    133, 134, 135

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# PART II
## "HEAVYCON" Standard Transportation Contract

to be paid for by the Owners except as otherwise provided for in this Contract.    136

**5.  Permits/Licences**    137
5.1. All necessary permits and/or licences pertaining to the loading and/or    138
discharging operations shall be provided and paid for by the Charterers.    139
The same applies to permits and/or licences pertaining to the carriage of    140
cargo. If required, the Owners shall assist the Charterers in obtaining such    141
permits and/or licences.    142
5.2. Any delay by the Charterers in obtaining the permits and/or licences re-    143
listed in sub-clause 5.1. shall be at the Charterers' time and any time lost    144
shall be paid for at the demurrage rate stipulated in Box 16.    145

**6.  Taxes, Charges, etc.**    146
The Charterers shall pay all duties, taxes and charges whatsoever levied on    147
the cargo and/or the freight at the loading port and/or discharging port irre-    148
spective of how the amount thereof may be assessed, including agency    149
commission assessed on the basis of the freight.    150

**7.  Quarantine**    151
Unless due to health conditions on board the Vessel, any time lost as a re-    152
sult of quarantine formalities and/or health restrictions imposed or incurred    153
at any stage of the voyage, including any such loss of time at the loading    154
port and/or the discharging port, shall be paid for by the Charterers at the    155
demurrage rate specified in Box 16. The Charterers shall also pay for all    156
other expenses which may be incurred as a result thereof.    157

**8.  Commencement of Loading/Cancelling Date**    158
8.1. The date of commencement of the loading shall be at any time on or be-    159
tween the first layday stated in Box 18 and the cancelling date stated in Box    160
11, both dates inclusive, in the Owners' option. Should the Owners give no-    161
tice of readiness prior to the first layday, the Charterers may, at their option,    162
accept such an earlier loading date and the time used shall count against    163
the free time as per Clause 12.    164
8.2. Should it clearly appear that the Vessel will not be ready to commence    165
the loading latest on the cancelling date the Owners shall immediately notify    166
the Charterers hereof and state a new cancelling date as soon as they are in    167
a position to state with reasonable certainty such new cancelling date.    168
Within 72 running hours after receipt of the Owners' notice as aforesaid and    169
latest when the Vessel is ready for loading, whichever is the earlier, the    170
Charterers shall advise the Owners whether they elect to cancel this Con-    171
tract, failing such advice the new cancelling date as notified by the Owners    172
shall apply.    173
8.3. Should the Charterers cancel the Contract according to sub-clause    174
8.2. any amount paid to the Owners in advance and not earned shall be re-    175
turned to the Charterers by the Owners.    176
8.4. The Owners shall not be responsible for any loss or damages whatso-    177
ever incurred by the Charterers as a result of the Charterers cancelling this    178
Contract as per sub-clause 8.2. nor shall the Owners be responsible for any    179
loss or damages whatsoever suffered by the Charterers as a result of the fai-    180
lure of the Vessel to be ready for loading latest on the cancelling date    181
agreed in Box 11 in the case that a new cancelling date has been agreed.    182
8.5. Should the cargo for reasons beyond the Owners' control, with the    183
exception of bad weather, not be loaded    184
within 24-28 days from tendering of notice of readiness, the Owners shall
have
the option to cancel this Contract.    185
If the Charterers exercise their option to cancel the Contract in accordance    186
with this sub-clause, the Charterers shall pay to the Owners the applicable    187
termination fee according to the provisions of Clause 20 in addition to any    188
demurrage incurred.    189

**9.  Notices**    190
9.1. Advance Notices of Expected Loadreadiness    191
The Owners shall give notices as per Box 12 of the expected day of the Ves-    192
sel's readiness to load 14 (fourteen) days, 7 (seven) days and 3 (three) days    193
in advance. Furthermore, the Owners shall give 24 (twenty-four) hours ap-    194
proximate notice of the expected hour of the Vessel's readiness to load.    195
9.2. Notice of Readiness    196
The Owners shall give notice of readiness by letter, cable, telex or telepho-    197
ne as per Box 12 after the vessel has arrived, advising when the Vessel is    198
ready to commence loading at
the loading port and when the Vessel is ready to commence discharge at the    199
discharging port as per Box 13. All notices may be given at any    200
time between 0600 and 1700 hrs local time of the
day, Fridays, Saturdays, Sundays and holidays excluded and notwithstand-    201
ing hindrances as referred to in Clause 3.3.    202
9.3. During the voyage the Owners shall give notice of expected time of arri-    203
val at discharging port(s) with intervals of the number of days stipulated in    204

Box 13.    205

**10.  Marine Survey/Condition of the Vessel and Cargo**    206
10.1. The Marine Surveyor(s) stated in Box 14 will be appointed for the    207
transportation. If Box 14 has not been filled in the Charterers and the Own-    208
ers shall agree on the appointment of Marine Surveyor(s) acceptable to the    209
cargo underwriters.    210
10.2. All relevant documentation required by the Marine Surveyor(s) for    211
their approval of the transportation shall be submitted by the Owners to the    212
Marine Sur-
veyor at the earliest possible stage after this Contract is made, if not already    213
submitted earlier. As soon as possible after submission of the relevant do-    214
cumentation, transportation approval shall be given by the Marine Surveyor.    215
The Charterers shall provide to the Owners and pay all expenses relating    216
to the production of docu-
mentation related to the cargo and/or the Charterers' equipment. The Own-    217
ers shall pay all expenses relating to documentation related to the Vessel    218
and all other equipment being provided by the Owners in the performance of    219
the transportation.    220
10.3. The Charterers shall arrange and pay for all the Marine Surveyor(s)    221
services, including their approval of the transportation.    222
10.4. Should the Marine Surveyor(s) not give transportation approval by the    223
date stipulated in Box 14, both the Charterers and the Owners may elect to    224
terminate this Contract and all freight paid or advanced by the Charterers to    225
the Owners shall be promptly refunded.    226
10.5. The Charterers warrant that the full description of the cargo mentioned    227
in Box 5 and as further already provided to Owners in correspondence    228
is presently correct and further warrant that the cargo is in all respects fit,
sound, strong and in every way fit for the transportation. The Charterers    228
further warrant that any future changes to the description of the cargo
between now and the time of loading will be advised to the Owners in a
timely manner
Should the cargo and/or its description not be in compliance with the afore-    210
said information provided prior to arrival of their Vessel at the loading    231
port, then the Owners shall have the option to cancel this Contract.
If the Owners exercise their option to cancel the Contract in accordance    232
with this Clause the Charterers shall pay to the Owners the applicable termi-    233
nation fee according to the provisions of Clause 20.    234

**11.  Freight**    235
The freight stipulated in Box 15 shall be paid in instalments as per    236
Additional Clause 34 (rate 10%)
upon signing of this Contract and the balance shall be fully prepaid upon    237
completion of loading against surrender of the Cargo Receipt/Bills of La-    238
ding whichever the case may be. The final instalment of the freight shall    239
be considered fully and irrevocably earned when due as set out in Box
16
upon completion of loading and shall be non-returnable whether the Vessel    240
and/or cargo is lost or not lost and whether lost due to perils of the sea or    241
howsoever. The freight instalments shall be paid discountless and be tele-    242
graphically remitted in the currency and paid into the Owners' bank ac-    243
count stipulated in Box 16.    244

**12.  Free Time/Demurrage**    245
12.1. The Charterers are allowed the free time stipulated in Box 17 in the    246
loading and discharging port(s) and for canal transit if applicable, Fridays,    247
Saturdays, Sundays and holidays included.    248
The free time at the loading port(s) shall start counting 6 running hours after    249
as from the time indicated on the
notice of readiness has, after it has been tendered, in accordance with    250
Clause 9.2.
whether in berth or not, unless loading has commenced earlier and shall    251
count until the first line for the float on cargo is in all respects fully-    252
understood on board the Vessel
and approved by the Marine Surveyor(s) has been taken by the vessel    253
The free time at the discharging port(s) shall start counting 6 running    254
hours from the time indicated on the
after notice of readiness after it has been tendered in accordance with    255
Clause 9.2.
whether in berth or not, unless discharge has commenced earlier and shall    256
count until the cargo is in all respects removed/floated off and    257
approximately 50 metres clear from the Vessel.
If the Owners are to load and discharge this cargo in accordance with Clau-    258
ses 4.3. (e) or (c) and 4.5. (a) or (c) free time or time on demurrage shall not    259
count for time used for the actual loading and discharge operation in excess    260
of the fixed hours stipulated in Box 17 of Part I, unless such time used is in ex-    261
cess of the fixed time is due to reasons beyond the Owners' control.    262

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to this pre-
printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of
discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "HEAVYCON" Standard Transportation Contract

12.2. Demurrage shall be payable for all time used in excess of the free time. 263
The demurrage rate for the Vessel is the amount stipulated in Box 19 calcu- 264
lated per day or pro rata for part of a day. 265

12.3. Free time shall not count and if the Vessel is on demurrage, demurra- 266
ge shall not accrue for time lost by reason of strike or lockout of the Master, 257
officers or crew or by reason of breakdown of the Vessel or the Owners' 258
equipment in this event, Owners shall reimburse Charterers for any 269
additional costs that they may incur for having tugs or other support
vessels standing by and waiting for the Vessel to be ready to load or
discharge.

12.4. The demurrage and other amounts which are calculated at the demur- 270
rage rate fall due and are payable by the Charterers immediately upon pre- 271
sentation of the Owners' invoice to the Owners' bank account stipulated in 272
Box 18. 273

Should more than 14 days of demurrage have accrued, the Owners are en- 274
titled to demurrage on account. The Owners may demand payment against 275
presentation of invoices covering the first 14 days and thereafter for every 7 276
days. 277

### 13. Mobilisation/Demobilisation 278

13.1. Mobilisation 279

If agreed upon in Box 19 the Charterers shall pay the lump sum stipulated 280
therein in respect of mobilisation, which amount shall be earned and non- 281
returnable upon the Vessel's arrival in the loading port. 282

13.2. Demobilisation 283

If agreed upon in Box 20 the Charterers shall pay the lump sum stipulated 284
therein in respect of demobilisation, which amount shall be earned and 205
non-returnable upon the Vessel's arrival in the discharging port. 286

13.3. The mobilisation and demobilisation amounts shall be payable 287
against the Owners' invoice. 288

### 14. Canal Transit 289

14.1. If the transportation is scheduled to pass through a canal according to 290
Box 7, the Charterers are granted free time for any such transit, and such 291
free time shall count against the number of hours stipulated in Box 17. If the 292
transportation is delayed beyond the free time stipulated therein, the Char- 293
terers shall pay for such extra transit time at the rate of demurrage stipula- 294
ted in Box 19 and shall, in addition, pay for all other documented extra ex- 295
penses thereby incurred. Canal transit time is defined as from arrival at pi- 298
lot station or customary waiting place or anchorage, whichever is the ear- 297
lier, and until dropping last outbound pilot when leaving for the open sea. 298

14.2. The freight rate stipulated in Box 15 is based upon the Owners paying 299
canal tolls limited to the amount stipulated in Box 21. Any increase in the ca- 300
nal tolls and/or any additional expenses imposed on the transportation for 301
the canal transit actually paid by the Owners shall be reimbursed by the 302
Charterers to the Owners upon presentation of the Owners' invoice. 303

14.3. Should the transit of a canal be made impossible for reasons beyond 304
the Owners' control, the Charterers shall pay for all extra time by which the 305
voyage is thereby prolonged at the rate of demurrage stipulated in Box 19. 306
The Charterers shall also pay all other expenses, including for bunkers, in 307
addition to those which would normally have been incurred had the Vessel 308
been standing-by in port less the amount of canal tolls being refunded to the 309
Owners for not having transited the canal. 310

14.4. Notwithstanding the provisions of sub-clause 14.3, the Owners may, at 311
their sole discretion, instruct the Master to discharge the cargo at the nea- 312
rest safe and reachable port or place and such discharge shall be deemed 313
due fulfilment of the Contract. All provisions of this Contract regarding 314
freight, discharge of the cargo, free-time and demurrage as agreed for the 315
original discharging port shall also apply to the discharge at the substitute 316
port. 317

### 15. Bunkers Escalation

This Contract is concluded on the basis of the price per ton for bunker oil 318
stated in Box 22 in force on the date of this Contract. 319

If the price actually paid by the Owners for the stated quantity of bunker oil 320
consu- 321
med during the transportation should be higher, the difference shall be paid 322
by the Charterers to the Owners. 323

If the price actually paid by the Owners for the stated quantity of bunker oil 324
consu- 325
med during the transportation should be lower, the difference shall be paid 325
by the Owners to the Charterers. 326

### 16. Ice 327

16.1. If no passage to the loading port or discharging port the Master finds 328
that the port cannot be safely reached owing to ice, the Owners shall re- 328
quest the Charterers to immediately nominate an alternative safe, ice-free 330

and accessible port where there are facilities for loading or discharging the 331
cargo. In this event, freight shall be paid at the rate applicable under this 332
Contract to such alternative loading or discharging port and, in addition, any 333
proved by which the time taken to reach either or both such alternative ports 334
exceeds the time which would have been taken had the Vessel proceeded 335
to her direct shall be paid for by the Charterers at the rate of demurrage 336
specified in Box 19 per running day and pro rata for part of a running day as 337
well as the costs of any additional bunkers consumed. If no rate of freight is 338
specified in Box 19 for the selected alternative port, then freight shall be 328
paid at the rate applicable for the voyage first nominated adjusted by allow- 340
ance at the demurrage rate specified in Box 19 for the difference in the time 341
taken for the actual voyage and the estimated time required to perform the 342
first nominated voyage, the costs of the difference in bunker oil consump- 343
tion and the difference, if any, in port charges at the respective ports. 344

16.2. If on or after the Vessel's arrival at or off the nominated loading port or 345
discharging port there is a danger of the Vessel being frozen in, the Master 346
shall be at liberty to proceed to the nearest safe and ice-free position and 347
shall, at the same time, request the Charterers by radio for revised orders. 348
Immediately upon receipt of such request, the Charterers shall give orders 349
for the Vessel to proceed to an alternative safe, ice-free and accessible port 350
where there is no danger of Vessel being frozen in and where there are facil- 351
ities for loading or discharging the cargo. 352

If the Vessel is ordered to proceed to an alternative port, the terms in respect 353
of freight and delay to be paid by the Charterers shall be as specified in sub- 354
clause 16.1, but if the Vessel loads or discharges at the nominated port 355
then the whole of the time occupied from the time the Master's request for 356
revised orders has been received by the Charterers until completion of loa- 357
ding or discharging shall count against free time or, if the Vessel is on de- 358
murrage, for demurrage. Any delay caused by reasons of the Vessel being 359
ordered to a port where there is danger of being frozen in shall count against 360
free time or, if the Vessel is on demurrage, for demurrage. 361

16.3. The Vessel not to be obliged to force ice nor to follow icebreakers. 362

### 17. Dangerous Cargo 363

If part of the cargo is of an inflammable, explosive or dangerous nature or 364
condition or at any stage may develop into such nature or condition it must 365
be packed and stored or stowed in accordance with IMO Dangerous Goods 386
Code and/or other applicable regulations always to the full satisfaction of 367
the Master. Any delay to the demurrage rate in this respect shall be paid for 368
by the Charterers at the demurrage rate stipulated in Box 19. 369

### 18. Lien 370

The Owners shall have a lien on the cargo and any Charterers' equipment 371
for all freight and all other expenses in relation to the transportation, dead- 372
freight, advances, demurrage, damages for detention, general average and 373
salvage including costs for recovering same. 374

### 19. Substitution 375

The Owners shall, at any time before the cancelling date, be entitled to sub- 376
stitute the Vessel named in Box 4 with another vessel of equivalent capabi- 377
lity and capacity, provided such substitute vessel is approved by the 378
Charterers and Mad- 379
or Surveyor. Nothing herein shall be construed as imposing on the Owners 380
an obligation to make such substitution. 380

### 20. Termination 351

20.1. Notwithstanding anything else contained herein, the Charterers shall 352
have the right to terminate this Contract prior to the Vessel's arrival at the 383
first loading port against payment of the applicable amount stipulated in Box 384
23 less any prepaid freight. 385

20.2. Furthermore, the Charterers shall have the right to terminate this Con- 386
tract after the Vessel's arrival at the first loading port but not later than upon 387
commencement of loading against payment of the applicable amount stipu- 388
lated in Box 23 plus compensation for all time spent at the first loading port 389
at the demurrage rate stipulated in Box 19 less any prepaid freight together 390
with the actual expenses incurred by the Owners in preparation for the loa- 391
ding. 392

20.3. If Box 23 is not filled in, this Clause shall not apply. 393

### 21. Liability for Cargo - Bill of Lading or Cargo Receipt 394

21.1. Notwithstanding anything else contained herein, the Owners shall be 395
liable for all loss of or damage of whatsoever nature to or sustained by the Ves- 396
sel, any liability in respect of wreck removal and the expense of moving, 397
lighting or buoying the Vessel, and any liability in respect of death or injury 398
of any of the Owners' employees, servants, agents or sub-contractors' per- 389
sonnel, and any liability in respect of other cargo on board not the subject of 400
this Contract, all of which shall be for the sole account of the Owners without 401
recourse to the Charterers, their servants or agents, and the Owners shall 402

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# PART II
## "HEAVYCON" Standard Transportation Contract

Indemnify, defend and hold the Charterers harmless from and against any 403
and all claims, losses, costs, damages and expenses of every kind and na- 404
ture including legal expenses arising from the foregoing. 405
21.2. Notwithstanding anything else contained herein, the Charterers shall 406
be liable for all loss or damage or delay of whatsoever nature and howso- 407
ever caused to or sustained by the cargo, including any property operated, 408
owned, hired and/or leased by the Charterers on board, and any liability in 409
respect of wreck removal and the expense of marking, lighting or buoying the 410
cargo, and any liability in respect of death or injury of any of the Charterers' 411
employees, servants, agents or sub-contractors' personnel, or the Marine 412
Surveyor(s) personnel, and all liabilities consequent upon loss, damage or 413
delay to the cargo, all of which shall be for the sole account of the Charte- 414
rers without recourse to the Owners, their servants or agents or insurers and 415
the Charterers shall indemnify, defend and hold all these harmless from and 416
against any and all claims, losses, costs, damages and expenses of every 417
kind and nature including legal expenses arising from the foregoing. 418
21.3. The Owners and the Charterers shall agree and state in Box 24 whe- 419
ther a Bill of Lading or a non-negotiable Cargo Receipt will be issued by Cap- 420
tain upon loading of the cargo. 421
 21.4. Bill of Lading 422
(a) If, as stated in Box 24, the Owners have agreed to issue a Bill of Lading, 423
same shall be on the "Heavyconbill" form which shall incorporate all 424
terms, conditions, liberties, clauses and exemptions of this Contract, inclu- 425
ding the Arbitration Clause. 426
(b) The Owners shall not be liable for any loss, damage or delay to cargo in 427
the period before loading and after discharge. 428
(c) Unless otherwise agreed, the cargo shall be shipped on deck at Ship- 429
per's risk and the Owners not to be responsible for any loss or damage or 430
delay to the cargo whatsoever and whether due to negligence of whosoever 431
or howsoever arising and by whomsoever caused, and the Bill of Lading is- 432
sued hereunder shall be so claused. 433
(d) If the cargo is shipped under deck, 434
(i)  The Hague Rules contained in the International Convention for the Unifi- 435
cation of Certain Rules relating to Bills of Lading, dated Brussels 25th 436
August 1924, as enacted in the country of shipment shall apply to the 437
Bills of Lading issued hereunder provided that when no such enactment 438
is in force in the country of shipment, the corresponding legislation of 439
the country of destination shall apply, but in respect of shipments to 440
which no such enactments are compulsorily applicable the terms of the 441
said Convention shall apply. 442
(ii)  Trades where Hague-Visby Rules apply 443
Notwithstanding the provisions of sub-paragraph (i), in trades where 444
the International Brussels Convention 1924 as amended by the Protocol 445
signed at Brussels on 23rd February 1968 – the Hague-Visby Rules – 446
apply compulsorily, the provisions of the respective legislation shall be 447
considered incorporated in the Bill of Lading issued hereunder. 448
(iii)  Trades where US COGSA apply 449
Notwithstanding the provisions of sub-paragraph (i), in trades where 450
the US COGSA 1936 applies compulsorily, the provisions of the Act 451
shall be incorporated in the Bill of Lading issued hereunder and shall, 452
subject to sub-clause (b) above, apply to the period prior to loading and 453
after discharging when the cargo is in the custody of the Owners. 454
(e) The Owners' liability for delay during the transportation shall be limited 455
in accordance with the applicable Hague or Hague-Visby Rules or US 456
COGSA 1936 to the same extent as for cargo damage. 457
 21.5. Cargo Receipt 458
(a) If, as stated in Box 24, the Owners have agreed to issue a non-negotiable 459
Cargo Receipt, same shall be as per the "Heavyconreceipt" form incorpora- 460
ting all terms, conditions, liberties, clauses and exceptions of this Contract, 461
including the Arbitration Clause. 462
(b) It is expressly agreed that neither the Hague Rules nor the Hague-Visby 463
Rules nor any statutory enactment thereof shall apply to this Contract and to 464
the Cargo Receipt, unless compulsorily applicable, in which case the Ow- 465
ners take all reservations possible under such applicable legislation, rela- 466
ting to the period before loading and after discharging and while the goods 467
are in the charge of another carrier, and to deck cargo. 468
(c) Unless otherwise agreed, the cargo shall be shipped on deck at the 469
Charterers' risk and the Owners not to be responsible for any loss or dama- 470
ge or delay to the cargo whatsoever and whether due to negligence of who- 471
soever or howsoever arising and by whosoever caused, and the Cargo Re- 472
ceipt issued hereunder shall be so claused. 473
(d) If the cargo is shipped under deck, the Cargo Receipt shall be claused 474
as per sub-clause (d) above. 475
(e) The Cargo Receipt shall always be claused "All Risks Insurance has 476
been placed for the full value of this cargo by the Charterers and in the name 477
of the Charterers and the Owners." 478

1 Indicate alternative 21.4. (Bill of Lading) or 21.5. (Cargo Receipt) as agreed, 479
in Box 24. 480

### 22. Insurance
22.1. Without prejudice to the Charterers' obligations and liabilities under 481
this Contract, the Charterers shall take out and, in their name and at their ex- 482
pense, maintain at all material times and throughout the duration of this 483
Contract a policy or policies of insurance in respect of all loss or damage to 484
the cargo up to the full value of the cargo including but not limited to a policy 485
or policies comprising All Risks cargo cover and cover against liabilities to 486
third parties (including liability in respect of death and injury and claims for 487
consequential loss), and wreck removal of the cargo. The Charterers shall 488
arrange at their expense that the Owners shall be named as co-insured un- 489
der the said policy or policies of insurance and arrange that the underwri- 490
ters waive the right of subrogation. The Charterers hereby agree to produce 491
the original certificates of insurance maintained hereunder to the Owners or 492
their appointed representatives when requested so to do. 493
22.2. The Owners shall arrange at their expense such insurance(s) as re- 494
quired to protect the Charterers against the Owners' liabilities under Clause 495
21.1. 496
The Owners hereby agree to produce the original certificate(s) of insurance 497
maintained hereunder to the Charterers or their appointed representatives 498
when requested to do so. 499
 500

### 23. Himalaya Cargo Clause
It is hereby expressly agreed that no servant or agent of the Owners (includ- 501
ing every independent contractor from time to time employed by the Own- 502
ers) shall in any circumstances whatsoever be under any liability whatso- 503
ever to the Shipper, Consignee or owner of the cargo or to any Holder of the 504
Bill of Lading for any loss, damage or delay of whatsoever kind arising or re- 505
sulting directly or indirectly from any act, neglect or default on their part 506
while acting in the course of or in connection with their employment and, but 507
without prejudice to the generality of the foregoing provisions in this Clause, 508
every exemption, limitation, condition and liberty herein contained and 509
every right, exemption from liability, defence and immunity of whatsoever 510
nature applicable to the Owners or to which the Owners are entitled here- 511
under shall also be available and shall extend to protect every such servant 512
or agent of the Owners acting as aforesaid and for the purpose of all the fo- 513
regoing provisions of this Clause the Owners are or shall be deemed to be 514
acting as agent or trustee on behalf of and for the benefit of all persons who 515
are or might be their servants or agents from time to time (including inde- 516
pendent contractors as aforesaid) and all such persons shall to this extent 517
be or be deemed to be parties to this Contract. 518
The Owners shall be entitled to be paid by the Shipper, Consignee, owner of 519
the cargo and/or Holder of the Bill of Lading (who shall be jointly and seve- 520
rally liable to the Owners therefor) on demand any sum recovered or reco- 521
verable by either such Shipper, Consignee, owner of the cargo and/or Hol- 522
der of the Bill of Lading or any other from such servant or agent of the Own- 523
ers for any such loss, damage, delay or otherwise. 524
 525

### 24. Both-to-Blame Collision Clause
If the Vessel comes into collision with another vessel as a result of the neg- 526
ligence of the other vessel and any act, neglect or default of the Master, 527
mariner, pilot or the servants of the Owners in the navigation or in the mana- 528
gement of the Vessel, the owners of the cargo carried hereunder will indem- 529
nify the Owners against all loss or liability to the other or non-carrying vessel 530
or her Owners in so far as such loss or liability represents loss of, or damage 531
to, or any claim whatsoever of the owners of the said cargo, paid or payable 532
by the other or non-carrying vessel or her Owners to the owners of said 533
cargo and set-off, recouped or recovered by the other or non-carrying ves- 534
sel or her Owners as part of their claim against the carrying vessel or Own- 535
ers. 536
The foregoing provisions shall also apply where the owners, operators or 537
those in charge of any vessel or vessels or objects other than, or in addition 538
to, the colliding vessels or objects are at fault in respect of a collision or 539
contact. 540
 541

### 25. General Average and New Jason Clause
General Average shall be adjusted and settled at the place indicated in Box 542
25 according to the York/Antwerp Rules, 1974, or any modification thereof, 543
but if, notwithstanding the provisions specified in Box 25, the adjustment is 544
made in accordance with the law and practice of the United States of Ame- 545
rica, the following clause shall apply: 546
"In the event of accident, danger, damage or disaster before or after the 547
commencement of the voyage, resulting from any cause whatsoever, whe- 548
ther due to negligence or not, for which, or for the consequence of which, 549
Owners are not responsible, by statute, contract or otherwise, the goods, 550
551

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expenses as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## PART II
### "HEAVYCON" Standard Transportation Contract

shippers, consignees or owners of the goods shall contribute with Owners 552
in general average to the payment of any sacrifices, losses or expenses of 553
general average nature that may be made or incurred and shall pay salvage 554
and special charges incurred in respect of the goods. If saving Vessel is 555
owned or operated by Owners, salvage shall be paid for as fully as if the said 556
saving Vessel or vessels belonged to strangers. Such deposit as Owners, 557
or their agents, may deem sufficient to cover the estimated contribution of 558
the goods and any salvage and special charges thereon shall, if required, 559
be made by the goods, shippers, consignees or owners of the goods to 560
Owners before delivery". 561

### 25. Strike 562
25.1. *Responsibility.* Neither the Charterers nor the Owners shall be respon- 563
sible for the consequences of strike or lock-out preventing or delaying the 564
fulfilment of any obligation under this Contract. 565
25.2. *Loading port.* In the event of strike or lock-out affecting the loading of 566
the cargo, or any part of it, when the Vessel is ready to proceed from her last 567
port or at any time during the voyage to the port or ports of loading or after 568
her arrival there, the Charterers may ask the Charterers to declare that they 569
agree to count the time as if there were no such hindrance. Unless the Char- 570
terers have given such declaration in writing (by telegram, if necessary) 571
within 24 hours, the Owners shall have the option of cancelling this Con- 572
tract. If part cargo has already been loaded, the Vessel must carry this in the 573
port of discharge, freight payable in full. Any savings of net profit in comple- 574
ting with other cargo shall be credited to the Charterers. 575
25.3. *Expected strike.* In the event of strike or lock-out which can reasonably 576
be expected - before the loading has commenced - to affect the discharge 577
of cargo, the Owners are at liberty to cancel this Contract unless the Char- 578
terers declare within 24 hours of receipt of Owners' notification of intended 579
cancellation that they agree to count the time at port of discharge as if there 580
were no such hindrance, without prejudice to the Charterers' right of order- 581
ing the Vessel to a substitute port of discharge in accordance with sub- 582
clause 26.4. Time for loading does not count in the said 24 hours. 583
25.4. *Discharging port.* In the event of strike or lock-out affecting the dis- 584
charging of the cargo on or after Vessel's arrival at or off the port of dis- 585
charge, the Charterers shall have the option of keeping the Vessel waiting 586
up to maximum 7 days against paying demurrage after the expiration of the 587
time provided for discharging or of ordering the Vessel to a safe port where 588
she can safely discharge without risk of being detained by strike or lock- 589
out. Such orders to be given within 48 hours after the Owners have given no- 590
tice to the Charterers of Vessel's readiness to discharge or of the Owners' 591
request for orders. After waiting 7 running days, the Owners shall be at liber- 592
ty to discharge the cargo at any safe port which they may, in their discretion, 593
decide on and such discharge shall be deemed to be due fulfilment of this 594
Contract. In the event of cargo being discharged at any such other port, the 595
Owners shall be entitled to freight as if the discharge had been effected at 596
the port or ports named in the Bill(s) of Lading or to which the Vessel may 597
have been ordered pursuant thereto. 598
25.5. *Notification.* The party who first learns about the occurrence of strike 599
or lock-out shall immediately notify thereof the other party. 600

### 27. War Risks 601
27.1. In these clauses "War Risks" shall include any blockade or any action 602
which is announced as a blockade by any Government or by any belligerent 603
or by any organized body, sabotage, piracy, and any actual or threatened 604
war, hostilities, warlike operations, civil war, civil commotion, or revolution. 605
27.2. If at any time before the Vessel commences loading, it appears that 606
performance of the Contract will subject the Vessel or her Master and crew 607
or her cargo to war risks at any stage of the adventure, the Owners shall be 608
entitled by letter or telegram despatched to the Charterers, to cancel this 609
Contract. 610
27.3. The Master shall not be required to load cargo or to continue loading 611
or to proceed on or to sign Bill(s) of Lading for any adventure on which or 612
any port at which it appears that the Vessel, her Master and crew or her 613
cargo will be subjected to war risks. In the event of the exercise by the Mas- 614
ter of his right under this Clause after part or full cargo has been loaded, the 615
Master shall be at liberty either to discharge such cargo at the loading port 616
or to proceed therewith. In the latter case the Vessel shall have liberty to 617
carry other cargo for Owners' benefit and accordingly to proceed to and 618
load or discharge such other cargo at any other port or ports whatsoever, 619
backwards or forwards, although in a contrary direction to or out of or 620
beyond the ordinary route. In the event of the Master electing to proceed 621
with part cargo under this Clause freight shall in any case be payable on the 622
quantity delivered. 623
27.4. If at the time the Master elects to proceed with part or full cargo under 624
sub-clause 27.3., or after the Vessel has left the loading port, or the last of 625
the loading ports, if more than one, it appears that further performance of the 626

Contract will subject the Vessel, her Master and crew or her cargo, to war 627
risks, the cargo shall be discharged, or if the discharge has been com- 628
menced shall be completed, at any safe port in vicinity of the port of dis- 629
charge as may be ordered by the Charterers. If no such orders shall be re- 630
ceived from the Charterers within 48 hours after the Owners have des- 631
patched a request by telegram to the Charterers for the nomination of a 632
substitute discharging port, the Owners shall be at liberty to discharge the 633
cargo at any safe port which they may, in their discretion, decide on and 634
such discharge shall be deemed to be due fulfilment of this Contract. In the 635
event of cargo being discharged at any such other port, the Owners shall be 636
entitled to freight as if the discharge had been effected at the port or ports 637
named in the Bill(s) of Lading or to which the Vessel may have been ordered 638
pursuant thereto. 639
27.5.(a) The Vessel shall have liberty to comply with any directions or re- 640
commendations as to loading, departure, arrival, routes, ports of call, stop- 641
pages, destination, zones, waters, discharge, delivery or in any other wise 642
whatsoever (including any direction or recommendation not to go to the 643
port of destination or to delay proceeding thereto or to proceed to some 644
other port) given by any Government or by any belligerent or by any orga- 645
nized body engaged in civil war, hostilities or warlike operations or by any 646
person or body acting or purporting to act as or with the authority of any Go- 647
vernment or belligerent or of any such organized body or by any committee 648
or person having under the terms of the war risks insurance on the Vessel, 649
the right to give any such directions or recommendations. If, by reason of 650
or in compliance with any such direction or recommendation, anything is 651
done or is not done, such shall not be deemed a deviation. 652
(b) If, by reason of or in compliance with any such directions or recommen- 653
dations, the Vessel does not proceed to the port or ports named in the Bill(s) 654
of Lading or to which she may have been ordered pursuant thereto, the Ves- 655
sel may proceed to any port as directed or recommended or to any safe port 656
which the Owners in their discretion may decide on and there discharge the 657
cargo. Such discharge shall be deemed to be due fulfilment of the Contract 658
and the Owners shall be entitled to freight as if discharge had been effected 659
at the port or ports named in the Bill(s) of Lading or to which the Vessel may 660
have been ordered pursuant thereto. 661
27.6. All extra expenses including extra war risks insurance costs incurred 662
in performance of the transportation and discharging of the cargo at the 663
loading port or in reaching or discharging the cargo at any port as provided 664
in sub-clauses 27.4. and 27.5.(b) of this Clause shall be paid by the Char- 665
terers, and the Owners shall have a lien on the cargo for all sums due under 666
this Clause. 667

### 28. Limitation of Liability 668
Any provisions of this Contract to the contrary notwithstanding, the Owners 669
shall have the benefit of all limitations of, and exemptions from, liability ac- 670
corded to the Owners or chartered Owners of vessels by any applicable 671
statute or rule of law for the time being in force, and the same benefits to ap- 672
ply regardless of the form of signatures given to this Contract. 673

### 29. Interests 674
If any amounts due under this Contract are not paid when due, then interest 675
at the rate of 1.5% per month or pro rata for part of a month shall be paid on 676
all such amounts until payment is received. 677

### 30. Agency 678
Vessel shall be addressed to Owners' agents at port(s) of loading and dis- 679
charging. 680

### 31. Brokerage 681
The Owners shall pay a brokerage at the rate stated in Box 26 to the Brok- 682
er(s) mentioned in Box 26 on any freight, demurrage, mobilisation fee, de- 683
mobilisation fee and/or lumpsum fee paid under this Contract. 684
If this full amount as aforesaid are not paid owing to breach of this Contract 685
by either of the parties, the party liable therefor shall indemnify the Broker(s) 686
against his or their loss of brokerage. 687

### 32. Law and Arbitration 688
*32. 1.* If agreed and stated in Box 27, this Contract shall be governed by Eng- 689
lish law and any dispute arising out of this Contract or any Bill of 690
Lading/Cargo Receipt is 691
sued thereunder shall be referred to arbitration the High Court of Justice in 691
London, any arbitrator 692
being appointed by each party, in accordance with the Arbitration Acts 692
1950 and 1979 or any statutory modification or re-enactment thereof for the 693
time being in force. On the receipt by one party of the nomination in writing 694
of the other party's arbitrator, that party shall appoint their arbitrator within 695
fourteen days, failing which the decision of the single Arbitrator appointed 696
shall apply. If two Arbitrators properly appointed shall not agree they shall 697

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## PART II
### "HEAVYCON" Standard Transportation Contract

| | | | |
|---|---|---|---|
| appoint an umpire whose decision shall be final. | 698 | Either party may call for arbitration by service of notice upon the other. If the | 709 |
| *) 32.3. If agreed and stated in Box 22, this Contract shall be governed by U.S. law and all disputes arising out of this Contract or any Bill of Lading issued thereunder shall be arbitrated at New York in the following manner: One arbitrator to be appointed by each of the parties hereto and a third by the two so chosen. Their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the court. The Arbitrators shall be commercial men. Such Arbitration is to be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc., New York, as currently amended. A sole arbitrator may be appointed, if so desired by both parties. | 699 700 701 702 703 704 705 706 707 708 | other party does not appoint its arbitrator within fourteen days of such action or else, then the first moving party shall have the right, without further action, to appoint a second arbitrator with the same force and effect as if said second arbitrator had been appointed by the other party. *) 32.3. If agreed and stated in Box 22, any disputes arising out of this Contract or any Bill of Lading issued thereunder shall be referred to arbitration at the place indicated in Box 22, subject to the law and procedures applicable there. 32.4. If Box 22 is not filled in, sub-clause 32.1. of this Clause shall apply. *) Indicate alternative 32.1., 32.2. or 32.3., as agreed in Box 22. | 710 711 712 713 714 715 716 717 718 719 |

**ADDITIONAL CLAUSES:**
**33. CONTACT DETAILS:**
**OWNERS:**
CONTACT PERSON: MARIO KERSSENS OR DAVE HANGOOR
TEL: + 31 10 403 5333; FAX: + 31 10 403 5344
EMAIL: mario.kerssens@fairstar.com or dave.hangoor@fairstar.com

**CHARTERERS:**
CONTACT PERSON: JIM ECCLES or RICHARD WESTON
TEL: + 44 1224 352226; FAX: + 44 1224 625914
EMAIL: jeccles@c-m-group.com or RWeston@c-m-group.com

**34. FREIGHT PAYMENT (SEE BOX 15 AND 16 AND CLAUSE 11)**
Should the entire freight not have been received in Owner's bank account by the time of the vessel's arrival at the discharging port, the Owners will have the right to delay the discharging operation, standing by, which stand-by time will be charged at the demurrage rate, until the moment that the freight has been received in Owner's bank account.

**35. Notwithstanding** what has been stated and / or agreed in Parts I and II of this contract, the following has been agreed and takes precedence over any other clauses and agreements in this contract:
For the accounts of Owners will be:
- Cost for preparation of stowage plans, stability / motion response analysis and a loading / transport manual
- Ballast engineers, line handlers and supervision at the loading and discharge port
- Time required and cost for moving, refitting and replacing / refitting stern caissons as necessary to accommodate the vessel as per agreed stowage plan
- Time required and cost for preparation of Vessel's deck using standard cribbing wood
- Time required and cost for loading, lashing, unlashing, discharging as per Owner's standards and criteria (compulsory stevedoring costs excluded) and as accepted by the warranty surveyor
- Deck cleaning after discharge

For accounts of the Charterers will be:
- Any charges for tug hours needed to commence, execute and complete the loading and discharging operation and, if needed, during the lashing and unlashing of the cargo
- Marine transport cargo insurance
- Cost for use of lashchain, if any
- Delays at the load and/or discharging ports / locations in excess of the granted free lay time if any, due to weather and/or sea conditions will be charged at the demurrage rate
- Any preparation of the cargo for transportation
- Any required craneage lifting gear for lifting, positioning, discharge of the non floating other items, blocks, etc belonging to the Vessel

**36. CONFIDENTIALITY**
This contract and the terms therein shall remain private and confidential to the signatories and the contents shall not be divulged to any third party except where necessary to comply with national regulations or the requirements of regulatory authorities. For Public relations purposes, aerial photographs only of the cargo on the deck of the vessel or photographs of the loading / discharging operation may be used. However disclosure of the any of the contents of this contract, freight or any other terms is strictly prohibited.

This document is a computer generated HEAVYCON form advised by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made in the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# EXHIBIT 2

CODE NAME: "HEAVYCON RECEIPT"

Charterer

C & MARINE SERVICES USA INC
308 CALDWELL STREET
ERATH, LA. 70533

**NON-NEGOTIABLE
CARGO RECEIPT**

CR No.

Reference No.

Export References:

Notify address

C & MARINE GROUP / SERVICES LTD
3RD FLOOR  REGENT CENTRE
REGENT ROAD
ABERDEEN, SCOTLAND  U.K.

Forwarding Agent (Name and address):

PANALPINA INC.  CHB  265A
201 EVANS ROAD
SUITE 301
NEW ORLEANS, LA. 70123
FMC 375  REF:  MSY800504

| Vessel | Port of loading |
| --- | --- |
| MV FJORD | PASCAGOULA, MS. |

Port of discharge
NEWCASTLE UPON TYNE, UK

| Charterer's description of goods | | Gross weight |
| --- | --- | --- |
| ICE MAIDEN | 1 HULL WITS COMPONENTS | 10,930,584KGS |

TIB'S INCLUDED WITHIN
554-3079479-6    6 PCS 4KVA UPS UNITS
554-3544011-4    4 PCS 6600V 2580KW GENERATORS
554-3543752-4    8 PCS 6600V 50HZ MOTORS
554-3079476-8    16 PCS SWITCHBOARDS / CONTROL PANELS
554-9622236-4    2 PCS 6600V 50HZ MOTORS
554-3079251-9    2 PCS TAUT WIRE SYS / JIB
554-3047981-0    4 PCS ELEC TRANSFORMERS

THESE COMMODITIES, TECHNOLOGIES, OR SOFTWARE WERE EXPORTED
EXPORTED FROM THE UNITED STATES IN ACCORDANCE WITH
THE EXPORT ADMINISTRATION REGULATIONS.  DIVERSION
CONTRARY TO U.S. LAW PROHIBITED
AES ITN    X20080428043732

(a) Quantity carried on deck
"ALL CARGO CARRIED ON DECK".

(b) Quantity carried under deck
"NO CARGO CARRIED UNDERDECK"

Unless specifically indicated in (b) above, all cargo is carried on deck at Charterers' risk; the Owners not to be responsible for any loss or damage or delay to such cargo whatsoever and whether due to negligence of whosoever or howsoever arising and by whosoever caused.

Issued pursuant to

Freight payable in accordance with the Contract.

R E C E I V E D on board for carriage the goods as specified above according to Charterers' declaration in apparent good order and condition - unless otherwise stated herin - weight measure, marks, numbers, quality contents and value unknown.

This document only serves as a Cargo Receipt as per Clause 21.5. of the Contract of Carriage dated as indicated on the front page of this Cargo Receipt.

FOR FURTHER DETAILS SEE OVERLEAF

Place and date of issue

PASCAGOULA, MS.

Signature

# EXHIBIT 3



## Fairstar

Co"adstraat 18
5th Floor, Suite E6.170
3013 AP Rotterdam
The Netherlands

P.O. Box 2225
3000 CE Rotterdam
The Netherlands

t +31 (0)10 403 53 33
f +31 (0)10 403 53 44
e fairstar@fairstar.com
i www.fairstar.com

C&M GROUP LTD
ATTN. MR. JIM ECCLES
5-19 HOLLAND STREET
ABERDEEN AB25 3UJ
ABERDEENSHIRE
SCOTLAND

**INVOICE**

| | |
|---|---|
| Number | 2008007 |
| Date | 30 June 2008 |

Regarding    Shipment of MV Ice Maiden I   Mobile/Newcastle or Belfast

We herewith charge your account as follows:

| | |
|---|---|
| Project related cost, arranged and paid by Fairstar for and on behalf of C&M Group Limited, see attached specification | USD 46,972 |
| Price difference fuel, see attached calculation | USD 57,600 |
| Demurrage, see attached calculation | USD 396,875 |
| Total | **USD 501,447** |

Our bank details:

HSH Nordbank AG
Account no: 1100308277
IBAN: DE 12 2105 0000 1100 3082 77
SWIFT: HSHNDEHH
In favour of Fairstar Heavy Transport N.V.

Kindly indicate following reference:
2008007/30062008/0356

**FAIRSTAR HEAVY TRANSPORT N.V.**



Conradstraat 18
6th Floor, Suite 16.170
3013 AP Rotterdam
The Netherlands

P.O. Box 2226
3000 CE Rotterdam
The Netherlands

t +31 (0)10 403 53 33
f +31 (0)10 403 53 44
e fairstar@fairstar.com
i www.fairstar.com

# Fairstar

## PRICE DIFFERENCE FUEL

Point 22 clause 15: USD 479 MT / fixed 3,600 mt

| | |
|---|---|
| Actual price as per attached: | USD 495.00 |
| Price per contract: | USD 479.00 |
| Difference | USD 16.00 |

Fixed 3,600 mt x USD 16,00 =     **USD 57,600.00**



Conradstraat 18
6th Floor, Suite 26.170
3013 AP Rotterdam
The Netherlands

P.O. Box 2225
3000 CE Rotterdam
The Netherlands

t +31 (0)10 403 53 33
f +31 (0)10 403 53 44
e fairstar@fairstar.com
i www.fairstar.com

# Fairstar

## PROJECT RELATED COSTS

| | |
|---|---|
| Extra insurance costs pit rental | USD 5,000.00 |
| Administration fee 10% | USD 500.00 |
| | |
| Pit rental | USD 150,000.00 |
| Handling fee 5% | USD 7,500.00 |
| | |
| Weather Routing Service MWS | USD 892.50 |
| Administration fee 10% | USD 89.25 |
| | |
| Stand-by boat "Dolfijn" (€ 17,920.00) | USD 28,224.25 |
| Administration fee 10% | USD 2,822.43 |
| | |
| Berthage SHEPPARD Quay NC | USD 1,943.76 |
| | |
| Total project related costs | USD 196,972.19 |
| | |
| Pit rental already invoiced (see our invoice 2008006 dated 23 May 2008) | USD -150,000.00 |
| | |
| **Total project related costs (this invoice)** | **USD 46,972.19** |



Conradstraat 18
6th Floor, Suite E6.170
3013 AP Rotterdam
The Netherlands

P.O. Box 2225
3000 C2 Rotterdam
The Netherlands

t +31 (0)10 403 53 33
f +31 (0)10 403 53 44
e fairstar@fairstar.com
i www.fairstar.com

## Fairstar

**DEMURRAGE**

**Contract**

|  |  |
|---|---|
| 4 days free | Load location |
| 3 days free | Discharge location |
| 2 days free | Sales discount |
| | |
| 9 days free | Total |

### _LT = UTC - 0500 hrs_

| | | |
|---|---|---|
| Pascagoula | 28-4-2008 | 0600 hrs lt |
| 4 days free time | 2-5-2008 | 0600 hrs lt |
| Sailaway Mobile | 4-5-2008 | 1100 hrs lt |

Demurrage USA          2 days and 5 hrs

### _LT = UTC - 0200 hrs_

| | | |
|---|---|---|
| New castle | 23-5-2008 | 1200 hrs lt |
| 3 free days | 26-5-2008 | 1200 hrs lt |
| 2 free days offer sales | 28-5-2008 | 1200 hrs lt |
| CoR Rotterdam | 31-5-2008 | 1500 hrs lt |

Demurrage Europe          3 days and 2 hrs

**Total demurrage          5 days and 7 hrs**

**Demurrage per day          USD 75,000**

**Total demurrage          USD 396,875**

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
FAIRSTAR HEAVY TRANSPORT NV,                       :
                                                   :
                            Plaintiff,             :          08 Civ.
                                                   :
      - against -                                  :
                                                   :
C&M GROUP LIMITED and C&M MARINE                   :
SERVICES USA, INC.,                                :
                                                   :
                            Defendants.            :
-----------------------------------------------------------------X

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut  )
                      )          ss: Town of Southport
County of Fairfield   )

      Charles E. Murphy, being duly sworn, deposes and says:

      1.      I am a member of the Bar of this Court and represent the Plaintiff herein.  I am

familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the

issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the

Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

## DEFENDANTS ARE NOT PRESENT IN THE DISTRICT

      2.      I have attempted to locate the Defendants, C&M GROUP LIMITED and C&M

MARINE SERVICES USA, INC. within this District.  As part of my investigation to locate the

Defendants within this District, I checked the telephone company information directory, as well

as the white and yellow pages for New York listed on the Internet or World Wide Web, and did

not find any listing for the Defendants.  I also performed a Google search on the Internet.

Finally, I checked the New York State Department of Corporations' online database which

showed no listings or registration for the Defendants.

3.      I submit based on the foregoing that the Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4.      Upon information and belief, the Defendants have, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendants.

## PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

5.      Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Peterson or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, be and is hereby appointed, in addition to the United States Marshal, to serve the Process of Maritime Attachment and Garnishment and/or the Verified Complaint, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendants.

6.      Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendants.

7.      To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple

-3-

delivery of the Process of Maritime Attachment and Garnishment to the various garnishes to be identified in the writ.

### PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

8.      Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendants, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

### PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

9.      Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served through the next day, provided that process is served the next day, to authorize service of process via facsimile or e-mail following initial *in personam* service.

-3-

17.    For the foregoing reasons, Plaintiff requests that the Court issue an Order

temporarily sealing the court file in this matter, including the Verified Complaint and all other

pleadings and Orders filed and/or issued herein until further notice of this Court or notification to

the clerk that property has been attached.

18.    This request is narrowly tailored to meet Plaintiff's needs. Once property is

attached, the case should be unsealed, as the interest underlying sealing the case will have been

largely eliminated.

Charles E. Murphy

Sworn and subscribed to before me
This 31th day of July 2008.

Notary Public/Commissioner of Superior Court

—5—